OPEN MEETING LAW — EXECUTIVE Session TO DISCUSS APPLICANTS FOR COLLEGE OF MEDICINE Under 25 O.S. 201 [25-201] (1971), augmenting the rights granted and reserved to the people by Article II, Section 1 and Section 3, Article III, Section 1 and 3, Article V, Section 1 through Section 8, and Article XXIV, Section 1 through 3, of the Oklahoma Constitution, the Admissions Committee of the University of Oklahoma College of Medicine cannot meet in a session closed to the public for the purpose of discussing, deliberating, recommending, determining, or deciding as to which applicants are to be admitted to the College of Medicine, or for the purpose of establishing policies relative to admissions at the College, since all of these things are a part of the entire "decision-making process" relative to which applicants will be admitted according to the policies, procedures, or standards that are in effect at an educational institution established and supported by the State of Oklahoma. The Attorney General has considered your request for an opinion wherein you ask, in effect, the following question: Can the Admissions Committee of the University of Oklahoma College of Medicine meet in a session closed to the public to discuss, determine and decide which applicants are to be admitted as students to the College of Medicine or to establish policies relative to the admission process at the College of Medicine ? In order to completely answer your question, it is necessary to first set forth certain preliminary considerations relating to the relationship of the public to government of the State of Oklahoma. Clearly the University of Oklahoma is an educational institution having a board of regents as provided for in Article XIII, Section 8, of the Oklahoma Constitution, in which is vested "the government of the University of Oklahoma". Pursuant to Article XXI, Section 1, of the Oklahoma Constitution, the University of Oklahoma is established by the State in the manner prescribed in Article III of the Oklahoma Higher Education Code and is supported by the State in the manner prescribed in ArticleXIII-A, Section 3, of the Oklahoma Constitution, and Articles II, IX, and X of the Oklahoma Higher Education Code. Thus, the University of Oklahoma is without a doubt an educational institution of the State of Oklahoma. The fundamental nexus between the people and the government of the State of Oklahoma is set forth in Article II, Section1, of the Oklahoma Constitution. That section reads as follows: "All political power is inherent in the people; and the government is instituted for their protection, security and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided such change be not repugnant to the Constitution of the United States." (Emphasis added.) Concerning the inherent political power of the people, the Supreme Court of Oklahoma in Simpson v. Hill, 128 Okl. 269, 263 P. 635
(1928), stated at page 637 as follows: ". . . The State is a political entity, or sovereign. Its reason for legal existence is the recognized necessity for rules regulatory of the relations of men. The sovereign owes its existence to its people, for they formed it and maintained it in the exercise of that right, which, by common consent, society concedes inheres in the members thereof. In the exercise of such rights, the Constitution of Oklahoma was formed, creating governmental agencies, whose powers and duties are defined therein. Such agencies cannot usurp the rights which inhere in the people and in the people alone, but such agencies have only such rights and powers as the people have surrendered them by the organic law." (Emphasis added.) Also pertinent is the case of Frantz v. Autry, 18 Okl. 561, 91 P. 193 (1907), wherein the Oklahoma Supreme Court stated at page 589 of the opinion as follows: "In a territory the source of all power is Congress. But in the formation of a constitution and state government the power emanates from the people. The delegates to the convention were not the agents or representatives of Congress, but they were the immediate agents and representatives of the people of the two territories. They derived their power and authority from the people in their sovereign capacity. And this is in harmony with the principles of the Declaration of Independence, which declares that 'governments are instituted among men, deriving their just powers from the consent of the governed,' and is in keeping with the doctrine announced by Lincoln when he uttered the immortal words, that this is 'government of the people, by the people and for the people.' " Emphasis added.) From the foregoing it is clear that the principles of self-government are basic to the Constitution and government of the State of Oklahoma. Concerning other enumerated rights granted or reserved to the people under the Oklahoma Constitution, Article II, Section 3 of sets forth the right to petition government for redress of grievances, Article III sets forth the right of suffrage, Article V, Section 1 through Section 8 reserves to the people the right of initiative and referendum and Article XXIV, Section 1 through Section 3 sets forth the right of the people to vote on proposed constitutional amendments. The exercise of these enumerated rights are the only means by which the people can alter or reform state government in the constitutionally prescribed manner. Thus, if these rights are restricted or inhibited, the ability of the people to constitutionally alter or reform state government is likewise restricted or inhibited. In addition to the various enumerated rights of the people, Article II, Section 33, like the Ninth Amendment to the United States Constitution, provides as follows: "The enumeration in this Constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people." Further, Simpson v. Hill, supra, held that powers not expressly or by necessary implication granted to the Legislature inhere in the people. Concerning the right of suffrage, Dove v. Oglesby,114 Okl. 144, 244 P. 798 (1926) held that the right of suffrage inheres in the right of self-government to which free exercise is essential. Also in Edwards v. Millar,21 Okl. 448, 96 P. 747 (1908), at page 461 the Court speaking of the Oklahoma Constitution stated as follows: "Probably no constitution was ever drafted that refers to the people so much power to be exercised by direct vote." Concerning the right of initiative and referendum, State v. Johnson,90 Okl. 21, 215 P. 945 (1923), refers to such right as the "supreme legislative power reserved to the people". Likewise, in the case of In re Referendum Petition No. 18, State Question No. 437, 417 P.2d 295 (Okl. 1966), the court refers to the right of initiative and referendum as a "sacred right". Concerning the people's right to vote on proposed amendments to the Oklahoma Constitution, the Oklahoma Supreme Court in Threadgill v. Cross,26 Okl. 403, 109 P. 558 (1910), stated at page 413 of the opinion as follows: ". . . When the people of the state are engaged in proposing and adopting a constitution or amendments thereto, they are exercising a legislative power and function of the highest order; and, while so engaged they constitute part of the legislative department of the state." (Emphasis added.) Concerning the right to petition government for redress of grievances, Article II, Section 3, of the Oklahoma Constitution parallels theFirst Amendment to the United States Constitution. Under the First Amendment to the United States Constitution this right is included together with freedom of association, freedom of speech and freedom of religion and is considered to be of a similar nature to those freedoms; and as such, is a preferred right. Thomas v. Collins,323 U.S. 516, 89 L.Ed. 430 (1945) and Schneider v. Smith,390 U.S. 17, 19 L.Ed.2d 799 (1968). As to the extent of theFirst Amendment right of petition, the United States Supreme Court in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 30 L.Ed.2d 642 (1972), at page 510, stated as follows: ". . . We rested our decision on two grounds: " (1) 'In a representative democracy such as this, these branches of government act on behalf of the people, and to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives . . . "(2) 'The right of petition is one of the freedoms protected by the bill of rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms' . . . "The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creators of the Legislature, and arms of the executive) and to the courts, the third branch of government. Certainly the right to petition extends to all departments of the government. The right of access to the courts is indeed but one aspect of the right of petition . . . ." (Emphasis added.) Thus, as can be seen from the above case, the right of petition extends to all departments or branches of government including administrative agencies. Further, the right of petition, like the other First Amendment rights, can in no way be restricted by a state, except where a clear and present danger exists in fact. Thomas v. Collins, supra. In recent years the Supreme Court has held that First Amendment rights are free from indirect deterrents or "chilling effects" of state action which falls short of direct prohibition or abridgment. See, Baird v. State Bar of Arizona, 401 U.S. 1, 27 L.Ed.2d 639 (1971); Keyishian v. Board of Regents, 385 U.S. 589, 17 L.Ed.2d 629 (1967)) Lamont v. Postmaster General, 381 U.S. 301,14 L.Ed.2d 398 (1965); Baggett v. Bullitt, 377 U.S. 360,12 L.Ed.2d 377 (1964) . Concerning the right to be physically present at the site of state government for the purpose of petitioning the government for redress of grievances, the United States Supreme Court in Edwards v. South Carolina,372 U.S. 229, 9 L.Ed.2d 697 (1963), reversed the defendants' convictions for breach of peace which resulted from the defendants refusing to leave the State Capitol Building when so ordered by a peace officer, and held that such convictions infringed upon the defendants' constitutionally protected First Amendment rights of free speech, free assembly and the right to peaceably petition the government for redress of grievances. As pointed out previously, the right of petition, right of suffrage, right of initiative and referendum, and the right to vote on proposed constitutional amendments, are the only constitutionally sanctioned means by which the people have to carry out their right to alter or reform state government as provided for in Article II, Section 1, of the Oklahoma Constitution. Further, the proper exercise of these rights would, of course, presuppose that the people have access to state government and knowledge of what state government is doing. Applying the foregoing principles to the instant question, it follows that for an Admissions Committee of a state-supported educational institution, or a college, school or branch thereof, to meet in a session closed to the public for the purposes of discussing, deliberating, recommending or deciding which applicants shall be admitted to such state educational institution, or for the purpose of establishing admission policies, not only has a "chilling effect" on the right of the public to be physically present and express any grievances they may have, but amounts to complete denial of such right; and would indirectly inhibit the other constitutionally prescribed and reserved rights of suffrage, initiative and referendum, and right to vote on proposed constitutional amendments, implicit in which is the rights of access and knowledge concerning state government, the same being the only constitutionally sanctioned means by which the people have of exercising their right to alter or reform the state government. In the specific area of meetings of public bodies in the State of Oklahoma, the Legislature has recognized and augmented the previously mentioned rights of the people by the enactment of 25 O.S. 201 [25-201] (1971), known as the Open Meeting Law, which reads as follows: "All meetings of the governing bodies of all municipalities located within the State of Oklahoma, boards of county commissioners of the counties in the State of Oklahoma, boards of public and higher education in the State of Oklahoma and all other boards, bureaus, commissions, agencies, trusteeships or authorities in the State of Oklahoma supported in whole or in part by public funds or entrusted with the expending of public funds, or administering public properties, must be public meetings, and in all such meetings the vote of each member must be publicly cast and recorded. "Executive sessions will be permitted only for the purpose of discussing the employment, hiring, appointment, promotion, demotion, disciplining or resignation of any public officer or employee; provided, however, that any vote or action thereon must be taken in public meeting with the vote of each member publicly cast and recorded. "Any action taken in violation of the above provisions shall be invalid. "Any member of the Legislature appointed as a member of a committee of either branch of the Legislature or joint committee thereof or a committee of the State Legislative Council shall be permitted to attend any executive session of any state agency, board or commission authorized by this act whenever the jurisdiction of such committee includes the actions of the public body involved." (Emphasis added.) Title 25 O.S. 202 [25-202] (1971), provides that any person violating any of the provisions of Section 201 is guilty of a misdemeanor. In spite of penal provisions in open meeting statutes, it has been held that such statutes are to be liberally construed for the public benefit. Society for the Protection of New Hampshire Forest v. Water Supply and Pollution Control Commission, 377 A.2d 788 (N.H. 1975); Herran v. Northwood,282 A.2d 661 (N.H. 1971); Board of Public Instruction v. Doran, 224 So.2d 693 (Fla. 1969), and Sacramento Newspaper Guild v. Sacramento County Board of Supervisors, 263 Cal.App.2d 441
(1968). In Society for the Protection of New Hampshire Forest v. Water Supply and Pollution Control Commission, supra, the New Hampshire Supreme Court stated at page 789 of the opinion as follows: "Enacted in 1967, the right to know law, R.S.A. ch. 91-A (Supp. 1973), was intended to increase public access to governmental proceedings in order to augment public control of government and to encourage agency responsibility. Since its enactment, this court has broadly construed the statute's provisions in order to further these objectives . . . ." (Emphasis added.) In Herran v. Northwood, supra, the Court stated as follows at page 633 of the opinion: "The construction defendant would have us attribute to the final approval provision would frustrate the primary purpose of the statute to permit freedom of access to public records and proceedings. Consistent with this purpose, the general term 'final approval' must be read to connote finality within the scope of the powers delegated to that board, commission, agency or authority subject to provisions of the statute." (Emphasis added.) Further, in Board of Public Instruction v. Doran, supra, the Court stated at page 699 of the opinion as follows: "The right of the public to be present and to be heard during all phases of enactments by boards and commissions is a source of strength in our nation. "One purpose of the Sunshine Law was to maintain the faith of the public in government agencies. Regardless of their good intentions, the specified boards and commissions, through devious ways, should not be allowed to deprive the public of its inalienable right to be present and to be heard at all deliberations wherein decisions affecting the public are being made." (Emphasis added.) The Open Meeting Law in Oklahoma is also subject to a liberal construction in view of the requirements of 25 O.S. 29 [25-29] (1971), which reads as follows: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application of laws of this state, which are to be liberally construed with a view to effect their objectives and to promote justice." Without question, the University of Oklahoma's governing board is subject to the Open Meeting Law. Further, in view of the language of 25 O.S. 201 [25-201], which reads: ". . . All other boards, bureaus, commissions, agencies, trustee-ships or authorities in the State of Oklahoma supported in whole or in part by public funds. . . .", subordinate boards, commissions or authorities of a governing board would be encompassed by the requirements of 25 O.S. 201 [25-201]. Attorney General Opinion 71-245 (4 Okl.OP.A.G. 204), held that a governing board or a subagency thereof which is supported in whole or in part by public funds is subject to the Open Meeting Law. Previously in Attorney General Opinion 69-350 it was held that although the University of Oklahoma Faculty Senate was supported by public funds it was not subject to the Open Meeting Law since it was not a governing board under the language of 25 O.S. 201 [25-201] as it existed in 1969. Subsequent to the 1969 Attorney General's Opinion, however, and prior to Attorney General's Opinion 71-245 (4 Okl.OP.A.G. 204), the language of 25 O.S. 201 [25-201] was amended by Chapter 232 O.S.L. 1971, to include more than just governing boards of state agencies. Further, other jurisdictions on the question of whether or not a subordinate or subagency of a governing board is subject to an Open Meeting Law have held the same at Attorney General's Opinion 71-245 (4 Okl.OP.A.G. 204). In Catheart v. Andersen, 530 P.2d 313 (Wash. 1975), the Supreme Court of Washington held that its State Open Meeting Law was applicable to monthly meetings of the University of Washington Law School Faculty. In so holding, the Washington Supreme Court relied upon the previous Florida case of Board of Public Instruction v. Doran, 224 So.2d 693
(Fla. 1969). In Town of Palm Beach v. Gradison,296 So.2d 473 (Fla. 1974), the Florida court held that a zoning and planning committee made up of citizen members appointed by the town council and only empowered to make recommendations, was subject to the Open Meeting Law. At page 476 of the opinion in that case, the court stated as follows: "A subordinate group or committee selected by governmental authority should not feel free to meet in private." Further, in Herran v. Northwood, supra, the New Hampshire Supreme Court held that its Open Meeting Statute applied to a budget committee of a town which had authority to submit proposed or recommended budget items, but which had no authority to take any final action on such items. In view of the foregoing, Attorney General Opinion 71-245 (4 Okl.OP.A.G. 204), is hereby reaffirmed. As to the functional application of the Open Meeting Law, it has been held that it is not limited to those meetings at which "formal" or "final" action is taken, but rather has been construed to encompass the entire "decision-making process" of a particular agency or entity. As pointed out above in Herran v. Northwood, supra, the New Hampshire Open Meeting Law applies to meetings of subordinate committees or agencies which only have the power to recommend or propose. Likewise, in Times Publishing Co. v. Williams, 222 So.2d 470 (Fla. 1969), the court held that it was the entire "decision-making process" that the Legislature intended to effect by the enactment of Florida's Sunshine Law and that the Legislature clearly intended to include more than the mere affirmative formal action of voting on an issue or the formal execution of an official document. At pages 473 and 474 of the opinion the Florida court stated as follows: "And it is the entire decision-making process that the legislature intended to affect by the enactment of the statute before us. This act is a declaration of public policy, the frustration of which constitutes irreparable injury to the public interest. Every step in the decision-making process, including the decision itself, is a necessary preliminary to formal action. It follows that each such step constitutes an 'official act', an indispensable requisite to 'formal action', within the meaning of the act. ". . . Clearly the Legislature must have intended to include more than the mere affirmative formal act of voting on an issue or the formal execution of an official document. These latter acts are indeed 'formal,' but they are matters of record and easily ascertainable (though perhaps ex post facto), not withstanding such legislation; and indeed the public has always been aware sooner or later of how its officials voted on a matter, or of when and how a document was executed. Thus, there would be no real need for the act if this was all the framers were talking about . . . The Legislature could only have meant to include therein the acts of deliberation, discussion and deciding occurring prior and leading up to the affirmative 'formal action' which renders official the final decisions of the governing bodies." (Emphasis by Court.) In Sacramento Newspaper Guild v. Sacramento County Board of Supervisors, supra, the Court held that California's Open Meeting Law included deliberations by a public body at a meeting as well as formal or final action. At page 485 of the opinion, the Court stated as follows: "There is nothing in the Brown Act to demarcate a narrower application than the range of governmental functions performed by the agency . . . Recognition of deliberation and action as dual components of the collective decision-making process brings awareness that the meeting concept cannot be split off and confined to one component only, but rather comprehends both and either. To 'deliberate' is to examine, weigh and reflect upon the reasons for or against the choice. (See Webster's New International Dictionary, 3rd ed.) Public choices are shaped by reasons of fact, reasons of policy or both. Any of the agency's functions may include or depend upon the ascertainment of facts. (Walker v. County of Los Angeles 1961 55 Cal.2d 626, 635,12 Cal.Rptr. 671, 361 P.2d 247.) Deliberation thus connotes not only collective discussion, but the collective acquisition and exchange of facts preliminary to the ultimate decision." (Emphasis added.) It is, therefore, the opinion of the Attorney General that your question be answered as follows: Under 25 O.S. 201 [25-201] (1971), augmenting the rights granted and reserved to the people by Article II, Section 1 and Section 3, Article III, Section 1 and Section 3, Article V, Section 1 through Section 8, and Article XXIV, Section 1 through Section 3
of the Oklahoma Constitution, the Admissions Committee of the University of Oklahoma College of Medicine cannot meet in a session closed to the public for the purpose of discussing, deliberating, recommending, determining, or deciding as to which applicants are to be admitted to the College of Medicine, or for the purpose of establishing policies relative to admissions at the College, since all of these things are a part of the entire "decision-making process" relative to which applicants will be admitted according to the policies, procedures, or standards that are in effect at an educational institution established and supported by the State of Oklahoma. (GERALD E. WEIS) (ksg)